Good morning. May it please the court, Martin Buchanan appearing for Appellant Renate Morales. The first issue before the court is whether the exhaustion and channeling requirements of sections 405 G and H even apply in this action against a private Medicare Part B provider. Our position is that the exhaustion requirement of 405 G does not apply here because we are not suing the United States, the Secretary, or any federal official. Well, haven't we gotten past that? I mean, our cases do suggest that if the claim arises under the Medicare Act, then it really doesn't matter who the formal defendant is. Haven't we already held that in the case in which the government wasn't a party? I believe the case you're probably referring to is the Doe-Smith case.  Doe-Smith. Doe-Smith. The reason I was referring to it generally is because I thought maybe you knew how to pronounce it. I don't, but I'm doing my best. Your Honor, in the Doe-Smith case, the only issue that was raised was whether the case arose under the Medicare Act. There was no argument made that the defendants were not infected. Well, but if a case can't arise under the Medicare Act because, I'm just focusing on your argument, we didn't sue the government or the Secretary, and therefore it can't arise under the Act. That case was incorrectly decided, was it not? No, no, I'm not arguing that a case against a private defendant cannot arise under the Medicare Act. What I'm arguing is that the language of 405H has two distinct requirements. A, it has to arise under the Medicare Act, and B, it has to be against the United States. Your position is that the 405G and H, taken together, don't apply as long as you don't sue the United States? They don't apply if you're not challenging any decision or action of the United States or the Secretary. And we're not challenging any decision of the Secretary. We're challenging the actions of a private Medicare provider which, instead of submitting a bill for these services to Medicare as its provider agreement required, it imposed a lien on my client's settlement proceeds. Yeah, and we're only talking, in this case, about the second set of treatments, right? Right, so there were a total of 20 physical therapy treatments. The first 12, they did submit a bill to Medicare, and my client paid reimbursement eventually out of the settlement proceeds. It's the second set of eight sessions that we're talking about. Let me ask a more pointed question. What is it that you hope to get out of this case? Put aside class action allegations. Your client, I take it what your position is your client should have only had to pay the amount of reimbursement to Providence, not the RAC rate, if you will? Yes, the RAC rate being over 10 times higher, correct. Don't the regs expressly allow that? Don't the regs expressly allow what, Your Honor? Charging the RAC rate. No, no. In other words, had the appropriate thing been done, let's assume they'd sent this on to Medicare. Medicare paid it, and then you later got a recovery from the tort fees. Could Medicare get back more than the amount that it paid, or would it be limited to the amount that it paid? Well, all I can go is by what Medicare actually did. No, I understand what it did the first time. I'm asking a different question. I think the regulations, as I read them, allow Medicare to, in effect, get back the RAC rate for the charges as opposed to just simply the amount that it paid. Is that true? I'll be honest with you. That has not been raised in the briefs by opposing counsel, and so I don't know the answer because I haven't looked at it. I'm not sure I know the answer either. I don't know, but I can say that certainly with respect to the first 12 physical therapy sessions, Medicare did not seek reimbursement of the RAC rate. It sought reimbursement of the reduced Medicare rate, which was something like one-tenth of what Providence was actually charging, or I think less than that. So I don't know of any reason why, even assuming that legally they could have. So now that I understand your position, let me ask you a different question. Why didn't your client simply say to Medicare, I got these treatments. I'd like you to pay for them? Because Medicare required a proper bill from Providence. But you had a bill. You had a bill. They sent you a bill. Eventually they sent a bill because they leaned the tort recovery and recovered an amount of money from it. Why didn't you go to Medicare at that point and say, I've now been forced to pay this bill that's covered by my Medicare. You should have paid it. Well, we have an allegation in the complaint that she did learn from Medicare that they would pay it if Providence would resubmit their bill and correct the clerical error. I understand the allegation. My question is, it seems clear here that for whatever reason your client never took any action with respect to Medicare as to these later treatments, correct? Well, I think the complaint can be read that she did make some kind of informal inquiry of Medicare, and Medicare told her, if they resubmit their bill in the proper format, we'll cover it. Okay, and they didn't? And they didn't. Okay, so why didn't at that point your client go back to Medicare and say, look, you're covering me. You're my insurance company. I've been forced to pay for these services. You should have paid for them. Well, I guess that's the key question, is whether there is some kind of administrative remedy that allows a beneficiary to go to Medicare and say, my provider is billing me and putting a lien on my settlement, and that's a violation, and so please remedy it. And so the whole issue in this case that we've been briefing all along is, is there any such administrative remedy? And of course, the district court focused on this, quote, informal dispute resolution process under the SMART Act. Well, we've briefed all the different reasons why that informal dispute resolution process was not available to us. A, it didn't exist at the time. It didn't go into effect until after all of these events. B, it doesn't apply to this kind of dispute because it applies to disputes where Medicare has a statement of reimbursement, says we want reimbursement for these conditional payments that we made, and you dispute and say, no, those should be removed. Well, that's not the type of dispute that we have here. And C, that informal dispute resolution procedure, there's no administrative or judicial review of the decision. And so if we had to go through that, we'd end up with no judicial review at all. So that, I mean, that's the administrative mechanism that the district court found was available to Ms. Morales to challenge what was going on here and to go to Medicaid and do exactly what you're suggesting. That procedure is simply not available and was not available and was not even in effect at the time. And so there are various others that have been suggested here, and we've covered those in the briefs, I think, and I'm happy to answer questions about any of the specific remedial mechanisms that have been suggested. And I understand the court's frustration. Like, why didn't she just go to Medicaid? But in all of the briefing, both in the district court and in the Ninth Circuit now, there's never been any showing that there is any remedial mechanism available for someone. You said Medicaid. You meant Medicare. I meant Medicare. I apologize. I make the same mistake often, too, but I was happy to see it explanated. Yeah. So the short answer to your question is that we have certainly discovered no administrative mechanism for someone in Ms. Morales' position to say to Medicare, hey, listen, we would like to lodge some kind of complaint that our provider... Well, but at the end, here's my problem, and I think you've correctly sort of tried to walk through these various mechanisms and said  there's no insurance company here, which it is. And what your client's real complaint is is that her insurer didn't pay for these services. Right? No. I mean, I don't think that is the real complaint. Her complaint is that her provider didn't ask the insurer to pay for the services. Correct. So under those circumstances, does she have some responsibility to go to the insurer and say, hey, I got some covered services. Would you please pay for them? Or can she just go directly to court and say, well, since my provider's screwed up, I don't have to come to you to ask you to cover? The answer to the question, I think, is in the absence of some administrative mechanism that gives her some way of, in the absence of some statutory or regulatory provision... And your position is there's no way that she could have gone to Medicare and said, I received some covered services. These guys have sent you a bill that you refused to pay on a technicality. Now they're not sending it back to you. Please pay that bill that they sent to you. No way she can do that. Well, they are. Not that I know of. I mean, not anything that's been cited in the briefs, Your Honor. And, again, reading the complaint in her favor, at this point, she did make some kind of contact with Medicare, and they told her, we need a proper bill in the correct format from your provider, and the provider never submitted it. So thereafter, she's excused from making any further contact? I'm not saying she's excused. What I'm saying is there's been no administrative remedy identified that she could have exhausted, and because of that, she was not required to. So I see I have about five minutes left. Unless the Court has any further questions, I'll reserve the rest of my time. Thank you very much. Good morning, Your Honors. May it please the Court, my name is Sean Sullivan, and I, with my colleague Kathleen Drumey, represent the appellee, Providence Health System, Southern California. I'll take about five minutes to address one of the reasons the appellant here has raised, specifically whether administrative exhaustion applies here, where the appellant is not suing the United States, the Secretary, or any other federal agent, official, or employee. Ms. Drumey will take the remaining ten minutes to address the two other interrelated issues, whether her claims are subject to administrative exhaustion because she's not challenging any decision of the Secretary. Wasn't your argument pretty easy? I heard your opponent say he's not contending that the Act doesn't apply simply because he's not suing the Secretary. He's saying that there's no administrative remedy here, and therefore, he doesn't have to exhaust them. But, and Your Honors making my point very easy here today, which is exactly that, that the court in Noom definitively decided that the test is whether or not the claims arise under Medicare. And if they arise under Medicare, they are subject to the administrative exhaustion. If there are administrative remedies. Correct. Which Ms. Drumey will address in further detail, but in going through those, so, and I'm happy to refer to that. Well, I may be mischaracterizing your opponent's position, and you can use all your five minutes, but when I asked him the question, he said he wasn't contending that the case was barred simply because he wasn't suing the Secretary. He said there's nothing to sue the Secretary about because he had no mechanism under which the Secretary could make a decision in this case. And I'm happy to allot all my time to Ms. Drumey to address the remaining issues to the extent that is the position. But in the briefs, appellant did take, at least make the argument that that was one of their intentions. And in this case, you know, as the court has already identified, we believe that he controls. I'm not getting your answer. Your learned friend says she couldn't have done anything with Medicare because there was no administrative mechanism by which to make a claim. So, therefore, she's excused from making that claim. How do you answer that? I would answer that there were many administrative mechanisms throughout the process. Give us one. Sure. And Ms. Drumey will address in detail. But we want her to start. Sure. We can defer to Ms. Drumey. Let's get her up here. You know the question. What was the mechanism? He says there are many. Let's start with one. All right. Let's start with one that was in one of her briefs below in front of the district court. Towards the end of her brief, she mentions that she could have filed a patient request for payment to Medicare directly under Form 496. That's the question I was asking your opponent. Hadn't she assigned her right to do so to the hospital? Well, we actually put that in our briefs, Your Honor. But I actually went on and did a little Googling. And I realized that's a very strange thing to bring up in this court. But, in fact, there are Medicare.gov instructions that if your provider says they're not going to file it, you can file the claim yourself. And she took that position in her briefs below. Could you give me the citation of that? Yeah. Not the Google site, but the reg site. I'd be happy. It's not a regulatory. It's a government instruction about the timely filing. But the patient form itself on its face talks about the patient being able to submit the payment to Medicare, which is a position that the appellant took below. Right. And on its face, the form shows questions about is this caused by an accident? Because what Medicare wants to see is this a Medicare secondary payor kind of situation, in which case other kinds of avenues may be required. But by filing that claim, she would have had the ability... So your position is that once the hospital declined to file the claim, I don't know whether it refused or declined, she should have filed that on her own. She had the opportunity to do so. That would have put her in the five-level appeal process, which would have led to judicial review. Let me ask a more difficult question. You guys collected your full RAC rate for these services? We've collected nothing. Well, I mean, you leaned the full RAC rate for the services. The lien is for actual charges. That's under the Medicare law. Right. Isn't it? I mean, I understand. And I've reread the act, and it strikes me that that may not have violated the law. But it also strikes me as bad. I mean, if you'd billed Medicare, they would have paid at a lower rate, and Medicare would have been entitled to recover that lower rate from the tort fees or out of any settlement. What you've done here is, in effect, screw your patient. Why shouldn't there be some remedy for that? Well, let me present our position as to how we view that. The Medicare secondary payor system comes out of a situation where the Medicare program used to pay in chase. Now, I understand how it works, and we've had lots of cases about it. My question is, had you merely sent the bill, resubmitted the bill to Medicare, as they said you should, Medicare would have paid you because they don't dispute that she's covered, and she would have, and Medicare would have been then available. They could have then chased her tort recovery. And had they chased it, they would have only recovered what they paid. Instead, what you've done is placed a lien on her tort recovery in an amount that's much greater than she would have been liable to had she paid, had you simply submitted the Medicare bill. You know, she may have no recourse about all this, but it doesn't make you look good. Well, she doesn't not only have any, she has recourse, and I'll get into that in a moment, if you'll permit me, but also as to this whole situation of originally submitting the bill for these March and April services. Even as Congress has recognized when it passed the SMART Act, there is a time delay and a lot of situations where Medicare may get submitted a claim, which the provider at the time doesn't realize, and Medicare may not realize is covered by the Medicare secondary payor situation, which goes to the first set of claims that went through. As to the second set of claims, we do not know what Medicare told her, other than the allegation that we have to... You know, why not submit and also lien? Why is, the problem here is it seems to me this record suggests that your client played a little fast and loose. We are not permitted to bill Medicare. We're really prohibited from billing Medicare. That's the whole basis of the Medicare Secondary Payor Act. There is a complete process for how a provider can bill, and once they're aware that it's a Medicare secondary payor system, and it's called the alternate billing system, which is what we're dealing with here, we're prohibited from billing with 120 days of a claim being made against the responsible third party, which in this case was the third party who ultimately came to the settlement. So we can't do that. That's the whole basis of the Medicare Secondary Payor Act, is they said we're not in this business of paying first anymore. And then expressly under the Medicare regulations and the Medicare Secondary Payor Guidelines, which are like eight chapters long, is the express provision in Chapter 2 at 40.2 that permits alternate billing. And that was the question I was asking your opponent. I mean, it seems to me unfair, but the regs seem to contemplate it. It's encouraging the provider to do the chasing rather than Medicare. But when you do the chasing, you're chasing at the rack rate origin. Which is expressly permitted by Medicare. I know, and that's what strikes me as unfair. Well, Congress did that as the inducement to get out of the business. And they hoped to save over a billion dollars by doing that in the most recent estimate when they did the SMART Act. So Congress really gave this opportunity to bill the actual charges instead of accepting the Medicare. What happened is that if the provider doesn't want to wait, they can choose to bill for the Medicare-approved amount. But they don't have to. They take the risk that maybe the settlement didn't turn out to be very good for the plaintiff, the appellant, and would have gotten potentially less than the Medicare-approved amount. So it is a risk-taking on the part of the provider that Medicare encouraged in order to get out of the pay-some-shake business itself. I don't quite understand why you bill Medicare for the first group of treatments and then lean the settlement as the second group of treatments. Well, as I mentioned, the information systems that Medicare has set up don't always call. They require coordination of when a patient appears to have Medicare secondary benefits available. And even as recognized by Congress in the legislative history of the SMART Act, that doesn't always happen. And so there's been numerous clarifications that have been issued by CMS, the agency responsible here for Medicare, that go to trying to help get that system better in place so you know early on that a patient has Medicare secondary payor situation. And Medicare should not be paying. See, I'm still getting back to the amounts. And this is the substantive thing that troubles me about the case. It may not procedurally help your opponent. First time through, you bill at the Medicare amounts, right? Yes. And then Medicare says they pay them and then they go back to the plaintiff in this case and they say we paid them, reimburse us. May I point out a regulation that is in the whole sections about Medicare provider agreements that if we had collected an amount which was allegedly improper, then CMS, the opponent could complain to CMS because CMS has total oversight over Medicare provider agreements and there are no private action acts. So tell me where, let's assume that this is her complaint. Her complaint is, look, first time worked fine. Medicare paid, Medicare came back to me and said reimburse us, and I did. Second time through, rather than giving me that opportunity, what you did was you billed, in effect you leaned the provider at the rack rates. And let's assume you actually collected it, the tort fees, assume you actually collected it. So now she's paid 10 times as much as she would have paid had you sent the bill to Medicaid. And that was Congress' decision. If it turned out that that was an incorrect collection under 489.40 through 42, CMS could have issued a notice to the provider saying you've improperly collected. CMS could have done it. Now my question is did she have a remedy under those? I understand the government could come down on you with its full force and power if you violate the act. My question is does she have a way to remedy that injustice? Well, and under those circumstances, then CMS has the ability to make her whole. I understand CMS has the ability to make her whole. Can you identify how she goes into the system and says I've been made unwhole, please make me whole? There is a complaint process. Because Medicare, CMS has oversight over the entire Medicare provider agreement, and only in one instance allows expressly action by a private party. Because they have that oversight, the process is to use the complaint process that we have provided in our brief. And if they do complain, and they can complain about not only quality of care issues, but also exploitation and abuse of Medicare beneficiaries under that complaint process, contrary to appellant view, you could have used that to go and tell. This is the process to go directly to the secretary. Yes, you go directly to CMS. So tell me why I'm wrong in reading that process as simply allowing the secretary to take disciplinary action under its contract, rather than make the beneficiary whole. Where do I find in that process any mechanism to make the beneficiary whole? Well, I pointed out 49.40 through 42, which goes to improper collections. But also... But all that says is that CMS has the power to take action against your client if your client has done something wrong. I've looked through that process, and maybe I've missed it. Is there anything in any reg in that process says at the end of that process the secretary can say, here, beneficiary, we're sending you back a check for $4,000? Well, until the collection is made, there's not been any proper action, and that's not happened in this case. As I mentioned earlier, she could have filed the claim long ago if that was not the case. Right. I understand that argument. I'm trying to understand your second argument, which is how does she get a remedy out of this problem? I understand how the secretary can at the end of the day say, Providence, you've been awful, and we're cutting off your contract with Medicare. Or, Providence, you've been wonderful, and we're not doing anything wrong. But how does she get a remedy? The beneficiary may not have a private cause of action here. I think that's one of the things that's been somewhat muted. When you're dealing with the Medicare provider agreement, except in the case of the EMTALA, the patient dumping areas where Congress expressly carved out the ability for a private action to be brought for a violation of a Medicare provider agreement, there is no private cause of action. I was asking a different question. Private cause of action means you're in court. I'm asking in this administrative process that you've identified, whose number I forget, but I've got in front of me someplace, CCB2A or something like that. In that process, is there any express provision for the secretary saying, you've complained about a provider. Here's what I'm going to do for you. I'm going to give you back the difference between what you had to pay and what you should have paid. Not in that process. But had she submitted the claim, she would have been able to use that as her argument. I understand that separate one. But you agree that, it's not designed to pay beneficiaries or to give them benefits. It's designed for the secretary to decide whether or not you're in compliance with your obligations under the Act and your agreements. It is overall designed for that because Medicare covers the space as far as whether or not there's violations of Medicare provider agreements. However, it provided an additional process through the complaint process to make sure that all the concerns were raised so it could exercise its appropriate oversight over violations. You need to present a claim to CMS here. She did nothing. She has a phone call where she said it was covered. But she doesn't say, oh, by the way, there was an accident that generated this. Had she filed a 490S, that would have been surfaced early on and we wouldn't be in court talking about this. Thank you very much. Thank you. Rebuttal? First of all, Judge Hurwitz, I want to make sure I haven't inadvertently conceded an issue. I did actually, what I meant to argue is that we're making two alternative arguments. One is that this entire channeling and exhaustion scheme does not apply here because it's a suit against a private Medicare provider. Okay, so you are making that argument. I am making that argument. So now that I've unfortunately asked your opponent to sit down too early, how do you get past the Ninth Circuit case on point? Just because it's never discussed? Because the issue wasn't raised and also, secondly, because in that case it was a suit against a plan D sponsor. And a plan D sponsor is different from a plan B provider. But it's a plan D sponsor, it's not the government or the secretary. Well, there are cases that say that if there's a private entity that assists the secretary in its administrative functions in determining coverage and carrying out the act like a plan D sponsor does or a fiscal intermediary does, then we are going to apply the channeling requirement to those private entities. So let me ask you the question. I'm not sure you want to use your rebuttal time on this, but you do. Cite me any case anywhere in the country that says the requirements of 405G or H don't apply as long as you choose to sue the provider, not Medicare. I don't have a case where only a provider was sued. We do have cases that we cited in our opening brief that say 405H only applies to the government. I'm asking you for a case that says you're excused from, assuming that there's the ability to exhaust, you're excused from the exhaustion requirement because you've made the voluntary decision to sue the provider and nobody else. I don't have a case that is precisely on point. Wouldn't that put an enormous... Let's assume you had a very clear administrative remedy here for a moment. I know you say you don't. Let's assume there's a plain administrative remedy. And you say, well, I don't have to exhaust because I'll just sue the hospital. Well, I think that would be permissible because... Really? Yes, because 405, as long as it's only a suit against a private entity, I mean, the other reading would read words right out of 405H. Because it has to arise under the Medicare Act, it has to be against the United States, the secretary, or an official or employee. And the contrary interpretation reads those words right out of 405H. The cases that I was referring to are on page 13 of our opening brief. Those are cases, an 11th Circuit case, Brooks, that says 405H has no application to claims not brought against the United States or the Secretary of Health and Human Services. Also, the Bodimetric Health Services case cited on the same page from the 7th Circuit says 405H precludes only those actions brought against the United States, the secretary, or any officer or employee thereof. So, and I do concede on the next page, we do cite cases where there are fiscal intermediaries that are sued and they are performing administrative functions on behalf of the government and therefore the channeling requirement applies to them. But a private Medicare provider doesn't perform any functions for the government. It simply provides services to Medicare recipients and bills the government for them. But your complaint in this case, if I can sort of rephrase it, is that this private provider should have submitted your claims to Medicare. That's right. So, why isn't that very close to the cases that involve people who perform services for Medicare? The service they should have provided here is submitting the claim to them. But the services, those cases involve services that an entity is performing for the government, administering the program, or actually determining coverage like a fiscal intermediary determines coverage for the secretary and the regulations define those entities as acting for the secretary. That's what makes it different. I know I didn't mean to spend so much time on that issue. I warned you. I just want to briefly say in terms of this, of whether my client had a right to directly bill Medicare herself, the defense never even argued that in their brief. They have all the administrative remedies that they claim were available to her. That's not one of them. And so, I haven't had an opportunity to brief it. I don't know what this Google search is that counsel refers to. This is something that's coming up for the first time in oral argument. And below, they conceded that we had, that my client had assigned her right to bill Medicare. She'd assigned it, but she didn't. Does that mean she gave it up? Or that merely that she gave them the ability to bill on her behalf? I don't know the answer because the issue wasn't raised, Your Honor. I wish I had the answer, but it hasn't been briefed. Thank you. Unless there are questions. All right. If there are no further questions, Morales versus Providence Insurance Health System will be submitted.
judges: Bea, Hurwitz, Motz